## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CHARLES J. CHESTANG,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION FILE** |
| | : | |
| **v.** | : | **NO. 1:06-CV-0999-AJB** |
| | : | |
| **AAA AUTO CLUB SOUTH,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER AND OPINION[1]</u>

Before the Court is Defendant's Motion for Summary Judgment, [Doc.30]. For the reasons set forth herein, the motion is **GRANTED**.

## I.    INTRODUCTION

On April 26, 2006, Plaintiff, Charles J. Chestang ("Plaintiff"), proceeding *pro se*, filed a civil action against AAA Auto Club South ("AAA"), John Droese ("Droese"), and Lori Langland ("Langland"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ("Title VII"), and age discrimination, in violation of the Age Discrimination in

---

[1]      The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [Docs. 13, 14]. Therefore, this Order constitutes a final Order of the Court.

Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* On August 10, 2006, the Court

dismissed Plaintiff's Title VII and ADEA claims against Droese and Langland since

neither was Plaintiff's "employer" for purposes of Title VII or the ADEA, [Doc. 19].

Following the close of discovery, Defendant timely filed a motion for summary

judgment, [Doc. 30]. With briefing completed, the Court turns to Defendant's motion.

## II.    PRELIMINARY MATTERS

   A.    *Plaintiff's Failure to Respond to All of Defendant's Undisputed Facts*

   Although Plaintiff purports to deny several of Defendant's factual assertions in

his response to Defendant's statement of undisputed material facts ("DSMF,")

[Doc. 30, Att. 1], he has not cited to any evidence of record in support of these denials.[2]

Defendant contends that because Plaintiff has not rebutted these statements of

undisputed fact with citations to evidence in the record, they should be considered

admitted.

   N.D. Ga. R. 56.1B provides, in relevant part:

   (2) A respondent to a summary judgment motion shall include the
   following documents with the responsive brief:

_____

   [2]    *See* Plaintiff's Statement of Disputed and Undisputed Material Facts
("Pl. Resp.") ¶¶ 29, 46, 59, 61, 64, 65, 68, 70, 71, 72, 73, 74, 75, 78, 79, 80, 83.
[Doc. 41].

AO 72A
(Rev.8/8
2)

     a. A response to the movant's statement of undisputed facts.

       (1)   This response shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts.

       (2)   This Court will deem each of the movant's facts as admitted unless the respondent: (i) *directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number)*; (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).

N.D. Ga. R. 56.1B(2) (2006) (emphasis supplied).  Thus, statements of fact supporting and opposing summary judgment motions must cite to evidence in the record to be considered; naked denials are insufficient.  *Garland v. Advanced Medical Fund, L.P., II*, 86 F. Supp. 2d 1195, 1199-1200 & n.4 (N.D. Ga. 2000) (citing N.D. Ga. R. 56.1B(3)).

     Plaintiff has failed to properly respond to Defendant's statement of material facts. For example, in response to DSMF ¶ 29, citing to Plaintiff's deposition and the reference to a report of a customer's (referred to as a member's) complaint about Plaintiff, Plaintiff responded, "How can I be belligerent, children are belligerent and I am an adult."  (Pl. Resp. ¶ 29).  Also, in response to DSMF ¶ 68, stating "Plaintiff

claimed that on John Droese's 'to do' list was to 'get rid of the black trouble maker,'" citing Pl. Dep. Exh. 45 (a letter Plaintiff wrote), Plaintiff replied simply, "I did not say this." (Pl. Resp. ¶ 68).

"In construing their pleadings, the courts afford *pro se* litigants some leniency. Nevertheless, *pro se* litigants have been consistently required to comply strictly with procedural rules." *Sun v. United States*, 342 F. Supp. 2d 1120, 1123 (N.D. Ga. 2004) (footnote omitted); *Watkis v. Payless ShoeSource, Inc.*, 174 F.R.D. 113, 118 (M.D. Fla. 1997) (citing *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989)) ("[O]nce a *pro se* litigant is in court, [s]he is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."); *see also Jarzynka v. St. Thomas University School of Law*, 310 F. Supp. 2d 1256, 1264 (S.D. Fla. 2004); *Allison v. Utah County Corp.*, 335 F. Supp. 2d 1310, 1313 (D. Utah 2004) ("Although the court construes *pro se* pleadings liberally, a *pro se* litigant is required to follow the same rules of procedure as other litigants.").

Nor does the Court have an obligation to parse a summary judgment record to search out facts or evidence not brought to its attention. *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 463 F.3d 1201, 1209 (11th Cir. 2006); *see also Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1322 (M.D. Fla. 2002) ("It is the obligation of the

AO 72A
(Rev.8/8
2)

non-moving party, however, not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 'requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Accordingly, the Court deems any of Defendant's factual statements that are supported by the record and not specifically controverted by Plaintiff with specific citations to record evidence to have been admitted for the purposes of the summary judgment motion.

Nonetheless, in situations where a plaintiff has not responded to a motion for summary judgment, the Eleventh Circuit has instructed district courts to review the motion and supporting documents to determine whether genuine issues of material fact exist. *See Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039-40 (11th Cir. 2004); *United States v. One Piece of Prop., 5800 S.W. 4th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).  Therefore, despite Plaintiff's failure to properly respond to Defendant's Statement of Undisputed Material Facts, the Court must still

AO 72A
(Rev.8/8
2)

determine if additional relevant facts reveal a genuine issue of material fact. *See Jackson v. City of Stone Mountain*, 232 F. Supp. 2d 1337, 1341-42 (N.D. Ga. 2002).

> B.     *Plaintiff's Contradiction of Deposition Testimony*

Defendant asserts that Plaintiff has partially or completely denied eighteen (18) of Defendant's undisputed facts that he admitted during his deposition. Defendant argues that Plaintiff should not be allowed to create disputed issues of fact through blatant contradictions to his deposition testimony.[3]

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, the party cannot thereafter create such an issue with an affidavit that merely contradicts without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984); *accord*, *Clay v. Equifax*, 762 F.2d 952, 955 n.3 (11th Cir. 1985). However, a court may only disregard subsequent affidavit or declaration testimony when it contradicts, without explanation, "previously given clear testimony." *Lane v. Celotex Corp.,* 782 F.2d 1526, 1532 (11th Cir. 1986).

_____

[3]     *See* P. Resp. ¶¶ 36, 37, 41, 44, 45, 48, 51, 60, 61, 62, 68, 71, 72, 73, 76, 79, 81. [Doc. 32, Att. 41].

AO 72A
(Rev.8/8
2)

In this case, Plaintiff has not submitted an affidavit or declaration. Instead, he either baldly denies or implies that he denies certain of Defendant's undisputed facts. For example, in response to Defendant's undisputed fact ¶ 72 - - "Plaintiff admitted that he never made any allegations of race discrimination in any of his correspondence or other communications with management or human resources prior to his termination" - - Plaintiff asserts, "I did contact HR about white manager, a white supervisor, and John Droese." (Pl. Resp. ¶ 72). In his deposition testimony, however, Plaintiff admitted that he had never made a complaint of race or age discrimination:

> Q:    OK. Now, isn't it true that in all of these things that you've written, you've never made a racial discrimination complaint against AAA prior to your termination, isn't that true?
>
> A:    I don't know if it was after – okay, maybe. Okay. Maybe.
>
> Q:    That's true?
>
> A:    Ok. Yeah, its true about that, right.

(Pl. Dep. at 146). Based on the foregoing, the Court finds that Plaintiff has given clear testimony to this specific question, and will not consider his denial. Any of Plaintiff's additional self-serving statements which clearly contradict his prior deposition testimony also will be disregarded by the Court. In consideration of Plaintiff's *pro se* status, however, the Court has reviewed the record and has relied on Plaintiff's

AO 72A
(Rev.8/8
2)

deposition testimony and the exhibits used during the deposition, as well as any other admissible evidence, to determine whether undisputed material facts remain to be tried in this case.

### C.     Plaintiff's Failure to Rebut Defendant's Legal Arguments

Defendant argues that Plaintiff's opposition contains conclusory statements that fail to reach the merits of Defendant's arguments, requiring that summary judgment be granted in its favor.

Defendant is correct that Plaintiff's brief consists of conclusory statements, such as "Plaintiff feels he has evidence to make a prima facie case of race and age discrimination" and "Plaintiff can overcome Defendant's alleged reason for terminating him."  [Doc. 32 (Pl. Motion to Deny Defendant's Motion for Summary Judgment ("Pl. Br.") ¶¶ 3, 5)].  Although courts liberally construe filings by *pro se* litigants, *see Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006), the Court cannot supply arguments for the parties.  *Ward v. United States*, 154 F.R.D. 291, 293 (M.D.Fla. 1994); *see also Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991) ("Despite liberal construction afforded *pro se* pleadings, the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues."). With this in mind, however, the Court must make "reasonable allowances so that a *pro*

8

*se* plaintiff does not forfeit rights by virtue of his lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Thus, to the extent that Plaintiff has suggested arguments in his response to Defendant's factual assertions, the Court will take these under consideration in the disposition of Defendant's motion. *Clark v. Bibb County Bd. of Educ.*, 174 F. Supp. 2d 1369, 1371 (M.D.Ga. 2001) ("[T]he Court must observe that pro se litigants are entitled to wide latitude when construing their pleadings and papers[.]") (citing *Traguth*, *id.*).

## III.    STATEMENT OF MATERIAL FACTS

The pertinent facts of this case at the summary judgment stage, construed in the light most favorable to Plaintiff as the non-moving party,[4] are as follows:

AAA Auto Club ("Defendant") is an affiliate of the American Automobile Association, a national not-for-profit organization that provides its members benefits related to travel, including emergency roadside assistance, insurance and travel planning and assistance. (D ¶ 1).[5] Plaintiff is an African-American male and was

---

[4]    In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)).

[5]    Paragraph numbers preceded by "D" refer to paragraphs in the "Defendant's Statement of Undisputed Material Facts." [Doc. 30, Att. 1]. Paragraphs

62 years old at the time of his termination. (D ¶ 2). Plaintiff worked as a fleet driver from February 5, 2001, until his termination in October 2005. (D ¶ 3).

At the beginning of his employment, Plaintiff was supervised by a manager, Chris Lowder ("Lowder"), and two team leaders, Rick Brashier ("Brashier"), a white male, and James Dunn ("Dunn") (race not provided). (D ¶ 4). Defendant terminated Lowder in 2001 and promoted Brashier to the position of manager. (D ¶ 5). In 2003, Defendant restructured its management and added the position of supervisor between manager and team leader. (D ¶ 7). Charles Reese ("Reese"), a black male approximately 30 years old, and Robert Johnson ("Johnson"), a white male in his late 40s, became Plaintiff's "supervisors." (D ¶¶ 8-10). Droese, a white male who joined Defendant as a Regional Manager in August of 2005, also had supervisory responsibility over Plaintiff. [Doc. 30, Att. 5 (Affidavit of John Droese ("Droese Aff." at 1))].

### A.     AAA Policies and Procedures

AAA employees receive a copy of Defendant's standards of conduct, which includes a copy of the company's professionalism policy. This policy states:

------------------------------

preceded by "P. Resp." refer to paragraphs in "Plaintiff's Statement of Disputed and Undisputed Material Facts." [Doc. 30, Att. 41]. Paragraphs preceded by "P. SOF" refer to paragraphs in "Plaintiff's Statement of Material Facts." [Doc. 32, Att. 1].

AO 72A
(Rev.8/8
2)

> No matter where employees work or what their position is, anytime they are working with a customer, they are a representative of the Club, and their performance and demeanor are direct reflections on the quality of our customer service.  Employees are expected to conduct themselves in a professional and courteous manner at all times.  Unprofessional conduct (i.e., loud outbursts, use of profanity, refusal to perform job duties, etc.) is inappropriate and will not be tolerated.  Depending upon the severity of the misconduct, the disciplinary action could range from a warning to termination.

(D ¶ 14).  Plaintiff received a copy of this policy.  (Pl. Resp. ¶ 13).

When the company receives a service call, a representative prepares a call detail report, which outlines the critical information related to call.  (D ¶ 16).  Members who are dissatisfied with the service they received may lodge a complaint with a dispatcher or their member service group.  (D ¶ 17).  If a complaint is filed regarding a specific call, it is included as part of the call detail report.  (D ¶ 18).

### B.   *Plaintiff's History of Member Complaints While Employed at AAA and Subsequent Counseling by Management.*

A call log from April 2003 reflects that a member reported to AAA that Plaintiff had been "disrespectful" toward her during a service call.  (Pl. Dep. at 44-45; Exh. 8).  On April 30, 2003, Defendant received another complaint about Plaintiff from a member who claimed that he was "rude."  (*Id*. at 46-47; Exh. 9).  On May 4, 2003, Plaintiff submitted a written response to these complaints denying the allegations, and

11

AO 72A
(Rev.8/8
2)

pointed out that the member who complained on April 30 was "ranting and raving" at him "before he got out of the truck." (*Id.,* Exh. 10). In his deposition, Plaintiff again denied that he behaved in a disrespectful or rude manner but did not dispute that the members had lodged the complaints. (*Id.* at 45-47).

On August 5, 2003, a member reported to AAA that Plaintiff was rude to him and that he did not want Plaintiff to assist him in the future. The record indicates that the dispatcher noted that during this service call, the member cursed at the dispatcher and that Plaintiff reported that the member was rude to him as well. (Pl. Dep. at 59-60; Exh. 12). On August 12, 2003, Plaintiff wrote a letter to Brashier, stating that the member's car had been in the woods and that AAA policy was not to take trucks off the pavement. Plaintiff also stated that the member lied about the location of the car to the dispatcher and also lied about Plaintiff being rude. (*Id.* at 60-62, Exh. 13).

On January 20, 2004, a member requested that a formal complaint be filed against Plaintiff for the manner in which he handled her service call. The member complained that Plaintiff did not remove the gas can stuck underneath her vehicle and that he caused her to receive a ticket by driving through a toll booth. The member claims she removed the can after Plaintiff raised the vehicle. The report reflects that Plaintiff attempted to push the vehicle off the can but was told by a police officer to

AO 72A
(Rev.8/8
2)

raise the vehicle instead.  (Pl. Dep. Exhs. 15, 16).  Plaintiff submitted a response to the complaint, claiming that he removed the can and then took the "most direct and safest route" with the vehicle.  (*Id.* at 64, Exh. 17).  Plaintiff testified that Brashier discussed the January 20, 2004, complaint with him.  (*Id.* at 66).

On March 26, 2004, a member called complaining that she was "very upset that the driver acted in the manor [sic] that he did.  She did not realize that he was going to get so bent out of shape.  She was nervous at this point to even ask him a question."  The member also reported that Plaintiff was "rude and belligerent," would not answer her questions, and had damaged her fender.  (Pl. Dep. at 70-71, Exh. 19).  In a written response and in his deposition, Plaintiff denied that he was belligerent and claimed that the member had "talked to [him] like he was a boy."  Plaintiff further explained that the member wanted him to violate AAA policy by having him drop the car off without her accompanying him.  (*Id*. at 72-73, Exh. 21).

After the March 26, 2004, incident, Cliff Rudd ("Rudd") met with Plaintiff to discuss the member's complaint.  Plaintiff testified that Rudd informed him there was no damage to the fender.  (Pl. Dep. at 74).  On April 15, 2004, Reese issued a memorandum entitled "Employee Coaching Session" about the incident.  The memo stated that "[p]art of [Plaintiff's] job in delivering superior service is to learn to help

13

reduce frustration by showing empathy to a member needing our help."  Under the "Objective" section, Reese wrote, "Enhance driver's customer service skills by emphasizing the need to be aware of their own attitude and how it reflects on AAA Auto Club South."  (*Id.*, Exh. 22).  Plaintiff claims he did not see this memorandum until after he was terminated.  (P. Resp. ¶ 38).

On May 21, 2004, a member called to complain that Plaintiff had charged him $10.00 for a six-mile tow.  The member stated that when he complained to Plaintiff about the charge, Plaintiff responded, "pay the amount and complain later."  The member also stated that Plaintiff had a bad attitude and was "grumpy and gruff the whole time."  (Pl. Dep., Exh. 24).  Plaintiff admits that he told the member that he would have to pay the charge but states that he added if the charge was later determined to be incorrect, AAA would reimburse the member.  (*Id.* at 80-81).  Plaintiff denies, however, that he was "grumpy and gruff" and testified that he spoke to the member "in a straight-forward manner."  (*Id.* at 82, Exh. 26).

In June 2004, Reese issued Plaintiff a written counseling report regarding the May 21, 2004, service call.  The report stated that this was the "first" written counseling for unprofessionalism and reprimanded Plaintiff for failing to show "empathy" to the member.  Reese cautioned Plaintiff that "[a]ny further incidents of a similar nature may

14

result in addition [sic] disciplinary action." (Pl. Dep., Exh.25).  Plaintiff admits that he received a copy of the counseling form, although he refused to sign it.  (*Id*. at 83).

On June 17, 2004, another member filed a complaint accusing Plaintiff of being "rude." (Pl. Dep., Exh. 27).  On July 2, 2004, a member complained that Plaintiff was "very rude" and felt that Plaintiff "endangered his life."  The record also reflects that this member was using "foul language" and that the dispatcher advised Plaintiff to drop the vehicle and leave the scene.  (*Id.,* Exh. 28).  Plaintiff filed a response to this complaint denying that he endangered the member's life and stated that he did not leave the scene as instructed by dispatch.  He also wrote that he instead took the member and vehicle to the desired location, the member apologized for cursing at him and gave Plaintiff a $5 tip.  (*Id.,* Exh. 29).

On July 20, 2004, a member reported that Plaintiff was "rude rough grumpy." (*Id.*, Exh. 30).  Plaintiff filed a response to this complaint denying any misconduct. (*Id.*, Exh. 33).  On August 5, 2004, Reese met with Plaintiff, and issued another written warning about his conduct during the July 20, 2004, service call.  Reese wrote that this was Plaintiff's "third" written counseling for "unprofessionalism" and again warned that "any further incidents of a similar nature may result in addition [sic] disciplinary action up to and including termination." (*Id*., Exh. 31).  Plaintiff testified that he did

15

not sign this form and contends that he followed AAA policy during the service call. (*Id*. at 93-95).

On January 21, 2005, Plaintiff received another complaint where the member reported that Plaintiff became upset during the service call and "went after" the member's wife with jumper cables. (Pl. Dep., Exh. 35). Plaintiff testified, and the record reflects, that he was the fourth driver on the scene because the previous drivers could not assist the member with the car. (*Id.* at 102-03; Exh. 35). Plaintiff filed a response in which he denied that he chased the member's wife with jumper cables and said that the member and his wife were lying. (*Id.* at 102; Exh. 36).

In August 2005, Droese assumed the position of regional manager and became one of Plaintiff's supervisors. (Droese Aff. at ¶ 1). Droese testified that shortly after he arrived, AAA received a telephone call from a member who complained that Plaintiff had refused her request to move her car four feet and had become angry and rude. (*Id*., Exh. A). Plaintiff claimed that the member did not make this request and reported that after he had left the premises, the member's friend had chased him down the street "ranting and raving and cussing" at him. Plaintiff apparently stopped his truck but thereafter locked himself in the vehicle, at the advice of the dispatcher, until the woman left. (Pl. Dep. at 106-09, 110; Exh. 37). Droese met with Plaintiff about the

16

incident the next morning.  Plaintiff testified that Droese told Plaintiff that there had

been a lot of complaints about him and that he would terminate Plaintiff if there were

additional complaints.  (*Id.* at 112-13).

After this meeting with Droese, Plaintiff contacted Kathy Hodes ("Hodes") in

Human Resources to tell her about Droese's threat to terminate him.  (Pl. Dep. at 113).

Hodes instructed Plaintiff to document the meeting in writing and Plaintiff complied.

(*Id.*, Exh. 37).  In this letter, Plaintiff recounted the events of the service call, including

the fact that the woman chasing him had tried to pull the door of his truck open and that

he had locked himself in the truck.  Plaintiff claimed that Droese reprimanded him for

rolling up his windows during the incident and opined that Droese "did not seem to care

about [Plaintiff's] safety.  His only concern was not losing money and getting a good

sterling report."  (Pl. Dep. 115-116, Exh. 37).

On September 7, 2005, Hodes sent a written response to Plaintiff's letter.  Hodes

acknowledged that the dispatcher told Plaintiff to roll up his windows and but noted

that she also had offered to call the police for Plaintiff but he declined.  She further

stated that "it is important that you understand that it is management's responsibility

to provide guidance to employees in an effort to discuss and determine process

improvements.  As you know, this member complaint did not result in a written

17

counseling, but rather an opportunity to discuss the issue at hand." (Pl. Dep. Exh. 38).

Plaintiff responded to Hodes in a September 29, 2005, letter, writing that he was not "unhappy" with how Droese handled the situation but merely "wanted to know why he felt [Plaintiff] handled the situation incorrectly." Plaintiff stated that he felt that Droese threatened to terminate him because he stayed in the truck and that Plaintiff had considered his safety first and would handle the situation the same way again. (*Id.*, Exh. 39).

On October 11, 2005, AAA received a complaint about Plaintiff from AAA member Lori Langland ("Langland"). Langland claimed that, after she had given written directions to Plaintiff, whom she did not identify by name but described as "an older, large African American man," Plaintiff "suddenly became very agitated, balled up the paper and angrily threw them across the cab, and told [her] they didn't do him no good!" (Pl. Dep. Exh. 42). Langland continued that, after she verbally gave Plaintiff the directions, "he got really agitated and hostile again, slamming the map book against the steering wheel." She claimed that she was "very hesitant to hang around [her] car because of this man. His rage and hostility began to scare [her]." (*Id.*).

After Langland's complaint, Droese again met with Plaintiff. Plaintiff denied that he balled up and threw the directions and called Langland a liar. (Pl. Dep. at 122-

123, 136).   Based on Langland's complaint and Plaintiff's prior warnings for unprofessional behavior, Droese sent Hodes an email reporting the incident.  (Droese Aff. ¶ 4, Exh.C).  Droese wrote that Plaintiff exhibited "a clear pattern of aggression and rude behavior" toward members and recommended Plaintiff's termination.  (*Id.*).

Hodes testified that she reviewed Drose's email and recommended to AAA's Corporate Employee Relations Manager that Plaintiff be discharged.  [Doc. 30, Att. 9 (Hodes Aff. ¶ 4)].  Corporate approved Plaintiff's termination.  (*Id.*).

Droese met with Plaintiff on October 14, 2005, and terminated him for complaints and unprofessional conduct.  (Droese Aff. ¶ 5).  Plaintiff testified that during this meeting, he asked to see Langland's complaint but Droese refused, saying "you don't need to see the letter.  You're good at calling human resources.  Anything you want, call human resources."  (Pl. Dep. at 136, Exh. 43).  Plaintiff claims that on or about October 22, 2005, he received a separation notice in the mail dated October 20, 2005, and signed by Charles Reese.  The notice stated that Plaintiff was terminated for violating company policy effective October 14, 2005.  (P ¶ 28) [Doc. 32, Exh. 26].

C.    *Plaintiff's Post-Termination Letters to AAA.*

On October 15, 2005, Plaintiff wrote a letter to Ed Schatzman, one of AAA's vice presidents, in which Plaintiff explained his version of events during the service call

19

to Langland.  He wrote that Langland was not telling the truth when she claimed he crumpled the directions she had given him and threw them at her.  He wrote that  he still had the directions in his possession as proof of his claim.  He stated that he told Droese this fact but that Droese told him that he did not care if the member was lying and that, regardless, he was terminating Plaintiff for member complaints.  Plaintiff also stated that he called Human Resources but that he did not receive a return call. He mentioned that Droese had previously threatened to fire him for member complaints but asserted that he had never been shown any paper work or given anything in writing documenting these warnings.  Plaintiff alleged that "it is evident from the situation . . . I was unjustly terminated."  (Pl. Dep. Exh. 44).

On October 25, 2005, Plaintiff wrote another letter, this time to Tom O'Brien ("O'Brien"), AAA's President.  Plaintiff again claimed that he was unjustly terminated. Plaintiff added, however, that Lowder "used the nigger word" and that "one of the things on Droese's 'to do' list was to get rid of the black trouble maker. . . ."  Plaintiff claims that he was the only person who would stand up to management and such conduct was not tolerated.  Plaintiff stated that he spoke out about safety training and the safety of the vehicles and that because he was black, none of AAA's separation

AO 72A
(Rev.8/8
2)

policies were followed.  He concluded that he knew that his termination "was in retaliation for contacting Human Resources and [his] race."  (Pl. Dep. Exh. 45).

D.      *Plaintiff's Deposition Testimony*

Plaintiff testified that the only race-related remark he heard at work was made by Lowder, who was terminated in 2001.  (Pl. Dep. 31, 154-57).  Plaintiff also testified that Reese often called him "old man" and asked him questions like "old man, can you do the job, old man do you think you can still get a girlfriend?"  (*Id*. at 158).  Plaintiff further testified that Reese did not like him because Reese was "short" with a "Napoleonic complex."  (*Id*. at 88).

Plaintiff testified that he considered Langland's letter to be racist because it described him as an "older, large African American."  (P SOF ¶ 54, Pl. Dep. 125).  Plaintiff stated that she should have referred to him as "the driver" or by his name. (Pl. Dep. at 126).

E.      *Plaintiff's Award of Unemployment Benefits through the Georgia Department of Labor*

Plaintiff applied for and received unemployment benefits after a hearing before an administrative hearing officer for the Georgia Department of Labor.  [Doc. 32, Exh. 29].  In a written opinion, the hearing officer noted that Plaintiff denied that he

21

was "rude or threatening" and that the witnesses for the employer, including Droese and

Brashier, "had no firsthand knowledge of the incidents" leading to Plaintiff's

termination.  The hearing officer found that:

> in the case of involuntary separation, the employer is charged with
> carrying the burden of proof that the claimant was at fault in the
> separation.  In the instant case, the majority of the testimony supplied by
> the employer was hearsay, because it was based on complaints from third
> parties who were not present at the hearing to be sworn in and
> questioned. . .  In the absence of sufficient testimony and evidence to
> show fault on the part of the claimant, no disqualification may be
> imposed.

*Id.*   The hearing officer found Plaintiff eligible for unemployment benefits.  *Id.*

The record does not indicate whether Defendant appealed the decision.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when no genuine issue as to any material fact is

present, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c).  The movant carries the initial burden of "informing the court of the basis for its

motion and of identifying those materials that demonstrate the absence of a genuine

issue of material fact."  *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840

(11th Cir. 2000) (citing *Celotex*, 477 U.S. at 323).  "Only when that burden has been

met does the burden shift to the non-moving party to demonstrate that there is indeed

22

a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.; see also EPL Inc. v. USA Federal Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999); *Duke v. Cleland*, 884 F. Supp. 511, 514 (N.D. Ga. 1995).

## IV.   DISCUSSION

### A.   *The Law in General: Title VII and the ADEA*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the anti-retaliation

AO 72A
(Rev.8/8
2)

clause of Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "[(1)] because he has opposed any practice made an unlawful employment practice by this subchapter, or [(2)] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  These two prohibitions on retaliation are generally known as the opposition clause and the participation clause, respectively.  *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). As with Title VII, an employer may not retaliate against an employee for opposing discrimination based on age or participating in investigations, proceeding or litigation surrounding a complaint.  29 U.S.C. § 623(d).

A plaintiff asserting a disparate treatment discrimination claim under Title VII and/or the ADEA can support a claim either by direct or circumstantial evidence. *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (same "principles governing the order and allocation of proof in cases arising under

24

Title VII" apply to claims arising under the ADEA as well).  Direct evidence is "evidence which, if believed, would prove the existence of discrimination without inference or presumption." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989)).  Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence.  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).

In cases where a plaintiff has no direct evidence, the Court considers whether Plaintiff can establish a case through circumstantial evidence. When analyzing a disparate treatment claim based upon circumstantial evidence, courts utilize the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  To prove a *prima facie* case of discrimination, a plaintiff must show that he was: "(1) a member of the protected class; (2) qualified for the position; (3) subjected to an adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class." *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).  The plaintiff has the burden of

AO 72A
(Rev.8/8
2)

establishing a *prima facie* case of discrimination.  If the plaintiff establishes this *prima facie* case, an inference of discrimination is raised, and a burden of production then shifts to the defendant to rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for its action.  This burden is "exceedingly light." *Holifield*, 115 F.3d at 1564.  If the defendant meets this light burden, the inference of discrimination is erased and the burden shifts back again to the plaintiff "to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *Id.* at 1565.  Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

> B.   *Plaintiff's Disparate Treatment Discrimination and Retaliation Claims under Title VII and the ADEA*
>
> 1.   *Direct Evidence*

To the extent that Plaintiff intends to argue he has direct evidence of race and/or age discrimination, or of retaliation, the Court concludes that Plaintiff has not provided direct evidence of discrimination under either Title VII or the ADEA.  For a statement to constitute direct evidence, the evidence must "prove[] [the] existence of [a] fact

26

without inference or presumption." *Wilson*, 376 F.3d at 1086 (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  "[O]nly the most blatant remarks, whose intent can be nothing other than to discriminate on the basis of [race] . . . constitute direct evidence of discrimination." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001) (quoting *Damon*, 196 F.3d at 1358). The Eleventh Circuit has found direct evidence where "actions or statements of an employer reflect [ ] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 643 (11th Cir. 1998) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)).  Further, "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Bass,* 196 F.3d at 1105 (quoting *Trotter v. Board of Trustees*, 91 F.3d 1449, 1453-54 (11th Cir. 1996)).

Plaintiff testified that he believed that Langland's letter was racist because she described him as "an older large African American man," rather than referring to him by name.  (Pl. SOF ¶ 21-22).  Plaintiff contends that Langland's alleged racism should be imputed to Defendant "because they embraced a racist letter and terminat[ed] [him]

27

for a racist letter . . . they took on the racism in the letter and use[d] it to fire [him], so they are party of it."  (Pl. Dep. at 149).

Used in this context, no reasonable factfinder could conclude that the phrase "African American man" approaches the level of direct evidence of racial discrimination.  First of all, Langland was a customer of AAA and not a member of its management.  Plaintiff does not contend that she exercised any direct control over his employment.  "[O]nly statements by persons involved in the decisionmaking process . . . could constitute direct evidence."  *Bass*, 256 F.3d at 1105.  Moreover, the source of the comment aside, to find that the phrase "African American man" constitutes direct evidence of discriminatory animus, the factfinder must infer not only that Langland's statement was racist rather than descriptive, but also that the decisionmakers interpreted it to be so and that the comment motivated their decision to terminate Plaintiff.  When a statement requires a single inference, let alone more than one, to be discriminatory, the statement is not direct evidence.  *See Wilson*, 376 F.3d at 1087 (statement that "women aren't typically in that type of position" could be inferred to be "observation of fact" and, therefore, not direct evidence); *King v. Kirkland's Stores, Inc.*, No. 2:04-cv-1055-MEF, 2006 WL 2239208, at *9 (M.D. Ala. Aug. 4, 2006)

28

(complaint from a customer that there were too many African-American employees at the store not direct evidence).

As direct evidence of age discrimination, Plaintiff claims that Reese frequently referred to him as "old man." Defendant asserts that Reese was not the decisionmaker with regard to Plaintiff's termination, (D ¶ 83). Droese testified that he decided to terminate Plaintiff and sought approval of this decision from Human Resources. *See* Droese Aff. at ¶¶ 2, 4. While Plaintiff does not exactly dispute that Droese was the decisionmaker, he points out that his separation form bears Reese's signature. *See* P. Resp. ¶ 83.

In any event, Reese's references to Plaintiff as "old man" also fail to qualify as direct evidence. "[T]he mere fact that a management employee reviewed and evaluated the challenged decision and supplied information (favorable or unfavorable) to the final decisionmaker does not elevate that employee to decisionmaker status absent evidence that the employee had authority to overrule the final decision." *Chambers v. Walt Disney World Co.,* 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001) (*citing Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1356 (11th Cir. 1999)). In this case, Reese, a supervisor, reported to Droese, the Regional Manager. *See* D ¶¶ 8, 11. There is no evidence in the record suggesting that Reese had the authority to overrule Droese or

29

Human Resources or that he even contributed to the decision to terminate Plaintiff's employment.   To the contrary, Reese stated only that he "agreed with upper management's decision." (Reese Aff. at ¶ 8).  Plaintiff has not submitted any evidence to the contrary.

Assuming that Reese could be considered a decisionmaker, Plaintiff has not provided any specific examples of when Reese allegedly called him "old man." He claims only that Reese generally referred to him in that manner.  "[R]emarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)[6]; *see also Schweers v. Best Buy, Inc.* 132 Fed. Appx. 322, 324 (11th Cir. 2005) (supervisor's references to the plaintiff as "old man" and "senior member of the management team" not direct evidence of age discrimination); *Medina Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 10 (1st Cir. 1990) (generally calling the plaintiff "old man" insufficient to show direct evidence).  Since Plaintiff has not linked Reese's age-related comments directly to his termination, they cannot be considered direct evidence.

---

[6]     Plaintiff himself appears not to believe any animosity by Reese toward him was based on age.  As discussed more fully below, Plaintiff testified that Reese did not like him because Plaintiff was apparently taller than Reese.  Plaintiff claims that Reese "was short" and had "a Napoleonic complex."  (Pl. Dep. at 88).

In the absence of direct evidence of race or age discrimination, the Court must analyze Plaintiff's claims under the circumstantial evidence framework.[7] *See Wilson*, 376 F.3d at 1086 ("If the alleged statement[s] suggest[], but do[] not prove, a discriminatory motive, then [they are] circumstantial evidence.").

_____

[7]     To the extent that Plaintiff intended to argue he had direct evidence of retaliation, the Court also finds that Plaintiff cannot establish direct evidence of any retaliatory motive.  Plaintiff asserts when he asked to see Langland's complaint, Droese allegedly told him to "call human resources because [he] was good at calling them." (Pl. Dep. at 135).  However, as discussed more fully below, Plaintiff has not submitted any evidence that he complained of either race or age discrimination in his communications with Human Resources or to anyone else at AAA prior to his dismissal.  Therefore, he has not engaged in protected activity under either statute.

Assuming that Plaintiff had complained of race or age discrimination in his communications with Human Resources, Droese's statement is open to multiple interpretations and, thus, cannot be considered  direct evidence.  In order to find this statement to be direct evidence requires the inference that it was the hypothetical protected activity that prompted Droese to terminate Plaintiff rather than the multiple complaints lodged against Plaintiff by AAA members.  Droese's statement just as easily may be interpreted as expressing his dissatisfaction that Plaintiff had challenged his authority to discipline him or that Plaintiff accused him of being uncaring, as it could have in response to any complaint of discrimination.  *See Funai v. Brownlee,* 369 F. Supp. 2d 1222, 1234 (D. Haw. 2004) (supervisor's threat to fire plaintiff not direct evidence because inference was required to find that the plaintiff's protected activity "and not the many other incidences of bad behavior cited in the coworkers' letter and the other accusations of misconduct against Plaintiff" motivated adverse action).

31

C.      *Circumstantial Evidence*

*1. Prima Facie Case of Race and/or Age Discrimination*

As noted, to prove a *prima facie* case of discrimination, a plaintiff must show that he was: "(1) a member of the protected class; (2) qualified for the position; (3) subjected to an adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class." *Kelliher*, 313 F.3d at 1275.  Under the disparate treatment approach, a plaintiff may establish a *prima facie* case of disparate treatment by showing that the "misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly." *Lathem v. Dept. of Children and Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999).  Defendant does not dispute that Plaintiff is a member of a protected class, that he was qualified for the position, or that he suffered an adverse action: termination.  Defendant contends that Plaintiff cannot show that he was subjected to a differential application of work rules or otherwise treated less favorably than younger, non-minority employees and, therefore, cannot establish a *prima facie* case of discrimination.

AO 72A
(Rev.8/8
2)

The elements of a *prima facie* case are flexible, however, and "were 'never intended to be rigid, mechanized, or ritualistic.'"   *Swierkiewicz v.Sorema N. A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999) (emphasizing "that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible").   Therefore, Plaintiff also could establish a *prima facie* case by showing that Defendant replaced him with someone outside of his protected class.   *See Cuddeback v. Fla. Bd. of Edu.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (indicating that a plaintiff can establish a *prima facie* case of discriminatory discharge by showing, *inter alia*, she "was replaced by someone outside the protected class"); *Kelliher*, 313 F.3d at 1275.

The Court finds that under either the replacement or disparate treatment frameworks, Plaintiff has failed to establish a *prima facie* case of race or age discrimination.   Plaintiff has not offered any evidence that he was replaced by a younger, non-African-American individual after his termination or, alternatively, that Defendant retained an employee outside his protected class(es) who had received numerous customer complaints of rude behavior.   Plaintiff has not even attempted to

33

offer such evidence, choosing instead to challenge Defendant's decision to discipline and eventually terminate him and/or the honesty of the complainants.

Accordingly, as Plaintiff is unable to establish a *prima facie* case under the discriminatory discharge or the disparate discipline framework, the Court concludes that Defendant's motion for summary judgment on Plaintiff's Title VII and ADEA disparate treatment/disparate discipline discrimination claims is well taken, and **GRANTS** summary judgment as to those claims.

### 2.    *Prima Facie Case of Retaliation*

A plaintiff establishes a *prima facie* case of retaliation by showing that (1) he engaged in a statutorily protected activity; (2) the employer took a materially adverse action against him; and (3) there is a causal connection between the protected activity and the materially adverse action. *See Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998); *Burlington Northern & Santa Fe R.R. v. White*, 548 U.S. at __, 126 S.Ct. 2405, 2414-15 (2006) (holding that "the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" to include all "materially adverse" actions). Defendant contends that Plaintiff cannot establish a *prima facie* case because he cannot demonstrate that he engaged in any protected activity before his termination. Defendant argues that, although Plaintiff

AO 72A
(Rev.8/8
2)

engaged in protected activity after his dismissal, no causal connection existed between his complaint and his termination.

An informal complaint, such as Plaintiff's letters to Defendant, may be protected by the anti-retaliation clause of the statute. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 n.11 (11th Cir. 1993) (citing *Rollins v. Florida Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)).  In order to be considered protected activity, however, a plaintiff must show that he opposed some unlawful employment practice.  In Plaintiff's pre-termination letters, including the two sent to Hodes, he disputed the members' versions of events, claimed that he followed AAA policy and procedure, and complained that Droese did not care about his safety, but did not assert discriminatory treatment based on race, age, or any other protected characteristic. *See, e.g.,* Pl. Dep., Exhs. 37, 39.  A statement in which the employee simply denies that an event occurred or addresses safety issues would not place the employer on notice that the employee was complaining of unlawful discrimination. *See Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1186 (N.D. Ala. 1999) (complaint must reference protected characteristic); *Crumpton v. St. Vincent's Hosp.*, 963 F. Supp. 1104, 1119 (N.D. Ala. 1997) ("In order to be protected activity, plaintiff must present evidence showing that [the defendant] knew that her concern or complaints related in some way to race and

35

a claim of being discriminated against on that basis"). Moreover, Plaintiff admits in his deposition that he did not make any complaints of discrimination until after his termination. *See* Pl. Dep. at 146. Since Plaintiff referenced neither race nor age in any of his communications with Defendant prior to his termination, these pre-termination letters are not protected activity under Title VII or the ADEA.

Fourteen days after his termination, on October 25, 2005, Plaintiff sent a letter to AAA's president alleging that he was fired because of his race and in retaliation for contacting Human Resources. (Pl. Dep., Exh. 45). While this communication arguably qualifies as protected activity, in order to establish a *prima facie* case of retaliation, there must some causal connection between the protected activity and the adverse action. To establish the causal connection prong, a plaintiff need only show that "the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

Plaintiff's post-termination letter, however, could not have motivated Droese to fire him. *See Johnson v. Booker T. Washington Broadcasting Svc., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (protected activity that occurred after termination could not have motivated discharge); *see also Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1063

36

(D. Minn. 1991) (no causal connection when retaliation for adverse employment action occurred before plaintiff engaged in protected conduct); *Brown v. Carilion Health System*, No. Civ.A. 7:05CV00487, 2005 WL 2931848 at *1 (W.D. Va. Nov. 3, 2005) ("It would be nonsensical to construe Brown's complaint as alleging that Carilion terminated her due to her engagement in a protected activity she did not even initiate until two weeks after her termination."). The Court, therefore, concludes that Plaintiff's post-termination protected activity is "wholly unrelated" to his discharge.

Accordingly, because  Plaintiff cannot show the requisite causal connection between the protected activity and his termination necessary to establish a *prima facie* case of retaliation under either Title VII or the ADEA, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's Title VII and ADEA retaliation claims.

>      B.      *Defendant's Legitimate Nondiscriminatory Reason and Plaintiff's Evidence of Pretext*

Although a court's analysis generally ends with a finding that the plaintiff failed to establish a *prima facie* case, *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), the Court nevertheless will address the remaining steps in the *McDonnell Douglas* analysis to show that summary judgment would be appropriate

37

even if Plaintiff had established a *prima facie* case of race and/or age discrimination. Defendant contends that it terminated Plaintiff because it received multiple member complaints about Plaintiff's rudeness or otherwise disrespectful and unpleasant conduct over approximately a two year period. AAA need only produce evidence that could allow a rational fact finder to conclude that it's discharge was not made for a discriminatory reason. *Standard*, 161 F.3d at 1331; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). AAA's articulated reason satisfies its burden of production on this issue. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994) ("The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for [discharging] the plaintiff.") (citing *Hill v. Seaboard Coast Line R. Co.*, 767 F.2d 771, 774 (11th Cir. 1985)).

Once the defendant has carried its burden of showing a legitimate nondiscriminatory reason for its actions, a plaintiff must "be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reason[] offered by the defendant [was] not its true reason[], but [was a] pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253). A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that

38

the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804-05). A plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, *id.*

Although far from clear, Plaintiff appears to assert two principal arguments to support his contention that Defendant's reason for terminating him is pretextual. In general, Plaintiff contends that he was not rude or disrespectful to the members who lodged the complaints, *see, e.g.*, Pl. Dep. at 45-46, 61-62, 72, 77, 81, 85, 131, and that he answered service calls according to AAA policies and procedures, *see* P. SOF ¶¶ 8, 9; P. Resp. ¶ 30). Plaintiff also contends that the Georgia Department of Labor ("DOL") decision awarding him unemployment compensation benefits demonstrates that Defendant's reason for his termination is false.

Plaintiff's first argument - - that he was not rude or disrespectful to members and therefore Defendant's discharge decision is pretext for unlawful discrimination - - is unavailing. A plaintiff cannot establish pretext by merely denying the alleged misconduct. In order to demonstrate pretext, he must show, not that he did not engage in the conduct, but rather that the decisionmakers could not have sincerely believed that Plaintiff engaged in the alleged conduct. *See Vessels v. Atlanta Indep. Sch. Sys.*,

39

408 F.3d 763, 771 (11th Cir. 2005) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991)).   Although Plaintiff denies being rude or disrespectful, and in some instances, accuses the members of lying, he does not dispute that AAA received multiple complaints about his behavior.   While Plaintiff claims that Droese told him that he "did not care if [Langland] was lying and that he was firing [Plaintiff] anyway," [Doc. 32, Pl. SOF ¶ 17], this was only one complaint.   The record reflects that Defendant received complaints over a two and a half year period from several different individuals, all making similar claims that Plaintiff was "disrespectful," "rude,"  "belligerent," "grumpy and gruff," and exhibited "rage and hostility."  *See, e.g.*, Pl. Dep., Exhs. 8, 9, 13, 19, 24, 27, 30, 35, 42.  Plaintiff has not shown that Droese or Hodes did not sincerely believe that he did not behave rudely to the several other members who complained about Plaintiff's conduct.   *See Hawkins v. Ceco Corp.,* 883 F.2d 977, 980 n.2 (11th Cir. 1989) (that the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.).  Moreover, even if Droese's remark establishes, at a minimum, a genuine fact question as to whether he sincerely believed Langland's complaint, Plaintiff still could not survive summary judgment because, as

40

noted above, he has failed to demonstrate a material fact question exists as to his *prima facie* case.

Similarly, the fact that Defendant's decision may have been unfair, either because Plaintiff was not actually rude or because he followed AAA policies and procedures on service calls, other than courteous behavior toward members, also is insufficient to demonstrate pretext. Courts "are not in the business of adjudging whether employment decisions are prudent or fair" but rather whether unlawful discriminatory animus motivated the challenged decision. *Damon*, 196 F.3d at 1361. This Court will not second-guess Defendant's decision to terminate an employee who allegedly behaved rudely to customers. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (quoting *Elrod*, 939 F.2d at 1470) ("federal courts do not sit as a super-personnel department that reexamines an entity's business decisions"); *Nix*, 738 F.2d at 1187 ("Title VII is not a shield against harsh decisions in the workplace.") (quotations omitted).

Plaintiff also argues that, according to AAA Standard Operating Procedure, "[a]ny counseling, member complaints or chargeable accidents, are held against the driver for a floating 12 month period." (P. SOP ¶ 30). Plaintiff has not cited to the record for this assertion, however, and a review of the standard operating procedures

41

filed as deposition exhibit 5 does not reflect such a policy.  Even if such a policy

existed, the Court notes that from January of 2005 until October 2005 (the last

complaint in 2004 occurred in June), Plaintiff received three separate complaints about

his attitude.  In the absence of evidence to the contrary - - evidence not present in the

instant action - - Defendant could have terminated Plaintiff for as few as one customer

complaint, if it so chose.  *Chapman,* 229 F.3d at 1030; *Nix*, 738 F.2d at 1187

("The employer may fire an employee for a good reason, a bad reason, a reason based

on erroneous facts, or for no reason at all, as long as its action is not for a

discriminatory reason.").[8]

The Court also observes that Defendant has submitted evidence that Droese

terminated a white employee for similar customer complaints.  (Droese Aff. ¶ 6; Exh.

E).  *See Twilley v. Burlington Northern & Santa Fe Ry. Co., Inc.*, 351 F. Supp. 2d 1299,

1306 (N.D. Ala. 2004) (a plaintiff can establish that an employer's legitimate,

---

[8]       Defendant also argues that AAA's hiring of Plaintiff when he was 58 years
old is evidence that Defendant did not discharge him because of Plaintiff's age.
However, Defendant has offered no evidence that Droese participated in that hiring
decision.  *See Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1261 n. 5
(11th Cir. 2001) (ruling that "differences in treatment by different supervisors or
decision makers can seldom be the basis for a viable claim of discrimination"); *Mack
v. ST Mobile Aerospace Eng'r, Inc.*, 195 Fed. Appx. 829, 844 (11th Cir. 2006) (finding
comparators not similarly situated to plaintiff because plaintiff reported to different
supervisor).

42

non-discriminatory reason was pretextual by showing that "there were employees, not within [his] protected class, who were similarly situated in all relevant respects, but who were treated more favorably"). While this evidence alone might not be dispositive, it further undermines Plaintiff's argument that Defendant's reason for discharging him was pretext for unlawful racial discrimination.

As to the DOL finding, the Court notes that a determination by that state agency regarding entitlement to unemployment benefits is not binding on this Court, nor preclusive to the issues presented by Defendant's motion for summary judgment.

In *Delgado v. Lockheed-Georgia Co.*, 815 F.2d 641, 647 (11th Cir.1987), the Eleventh Circuit addressed whether a finding by Georgia Employment Security Agency, the state agency that administered unemployment benefits at the time, that the plaintiffs were *not* entitled to unemployment benefits because of alleged violations of company policies precluded the same plaintiffs from pursuing employment discrimination claims in federal court. *Id*. at 647. The court concluded that, under the rationale set forth *University of Tennessee v. Elliott,* 478 U.S. 788 (1986), federal courts are not required to grant preclusive effect to unreviewed state agency determinations. *Delgado,* 815 F.2d at 647.

43

That in this case Plaintiff received a favorable decision from the state agency does not make the rule in *Delgado* inapplicable.  A state administrative ruling, such as the Georgia DOL decision, does not have a preclusive effect over a plaintiff's federal Title VII claims.  *See Bishop v. City of Birmingham*, 361 F.3d 607, 610 (11th Cir. 2004); *Stephens v. Georgia Dept. of Transp.*, 134 Fed. Appx. 320, 324 n.3, 2005 WL 1274481, at *4 (11th Cir. May 31, 2005) (no preclusive effect of state administrative decision because state agency was not considering merits of federal claims); *see also Crawford v. Chao*, 158 Fed. Appx. 216, 2005 WL 3303998 (11th Cir. Dec. 7, 2005).[9] Accordingly, because Plaintiff can establish neither a *prima facie* case nor demonstrate pretext, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's claims of race and age discrimination and retaliation under Title VII and the ADEA.

## V.    CONCLUSION

For the aforementioned reasons, the undersigned **GRANTS** Defendant's Motion for Summary Judgment, [Doc. 30], on all of Plaintiff's claims.

The Clerk is **DIRECTED** to enter judgment for Defendant.

---

[9]    *Compare Shields v. BellSouth Advertising & Pub. Co.*, 254 F.3d 986, 987 (11th Cir. 2001), where the Eleventh Circuit held that a State *superior court's* finding in an unemployment compensation appeal that there was no evidence that the decision maker terminated the employee based on a protected characteristic collaterally estopped the employee from alleging discriminatory discharge in a different  proceeding.

44

**IT IS SO ORDERED AND DIRECTED**, this the 14th day of May, 2007.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

45